IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ANGELA M. KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:16-cv-846-GMB |
| | ) | [WO] |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On June 12, 2013, Plaintiff Angela M. King applied for supplemental security income under Title XVI of the Social Security Act, alleging a disability onset date of January 1, 2013. King's applications were denied at the initial administrative level. King then requested a hearing before an Administrative Law Judge ("ALJ"). On November 14, 2014, the ALJ held a hearing and on April 21, 2015, he denied King's claim. King requested a review of the ALJ's decision by the Appeals Council, which denied her request on September 9, 2016. As a result, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration (the "Commissioner") as of September 9, 2016.

The case is now before the court for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Under 28 U.S.C. § 636(c)(1) and Rule 73 of the Federal Rules of Civil Procedure, the parties have consented to the full jurisdiction of the undersigned United States Magistrate Judge. Based on a careful review of the parties' submissions, the relevant

law, and the record as a whole, the court concludes that the decision of the Commissioner is due to be REVERSED and this matter REMANDED for further proceedings consistent with this opinion.

## I. STANDARD OF REVIEW

The court reviews a Social Security appeal to determine whether the Commissioner's decision "is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). The court will reverse the Commissioner's decision if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The court "may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner," but rather "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (citation and internal quotation marks omitted). "Even if the evidence preponderates against the Secretary's factual findings, [the court] must affirm if the decision reached is supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). Moreover, reversal is not warranted even if the court itself would have reached a result contrary to that of the factfinder. *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

The substantial evidence standard is met "if a reasonable person would accept the evidence in the record as adequate to support the challenged conclusion." *Holladay v. Bowen*, 848 F.2d 1206, 1208 (11th Cir. 1988) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)). The requisite evidentiary showing has been described as "more

than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The court must scrutinize the entire record to determine the reasonableness of the decision and cannot "act as [an] automaton[] in reviewing the [Commissioner's] decision." *Hale v. Bowen*, 831 F.2d 1007, 1010 (11th Cir. 1987). Thus, the court must consider evidence both favorable and unfavorable to the Commissioner's decision. *Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990).

The court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Id.* (citing *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*

## II. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). King bears the burden of proving that she is disabled, and she is responsible for producing evidence to support her claim. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

3

A determination of disability under the Social Security Act requires a five-step analysis. 20 C.F.R. § 404.1520(a). The Commissioner must determine in sequence:

(1) Is the claimant presently unable to engage in substantial gainful activity?
(2) Is the claimant's impairment(s) severe?
(3) Does the claimant's impairment(s) satisfy or medically equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the claimant unable to perform her former occupation?
(5) Is the claimant unable to perform other work given her residual functional capacity, age, education, and work experience?

*See Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910 (11th Cir. 2015). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (quoting 20 C.F.R. § 416.920(a)−(f)). "Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citing *Gibson v. Heckler*, 762 F.2d 1516 (11th Cir. 1985)).

### III. FACTUAL BACKGROUND AND ADMINISTRATIVE PROCEEDINGS

King was 37 years old at the time of the ALJ's decision. R. 105. She is single with three children, but lives without her children in a boarding house for people with developmental disabilities in Montgomery, Alabama. R. 64. She did not complete high school but attended special education classes through the eleventh grade. R. 48–49. She claims to suffer from schizophrenia, depression, arthritis, and fibromyalgia. R. 46. In the past, King worked as a cashier, an assembler, a cook, and a poultry worker. R. 37, 89, 215

4

& 217. She last worked as an assembler at STS Filing and at a chicken-processing plant in 2012. R. 32 & 203.

Following an administrative hearing, the ALJ found that King did not suffer from any severe impairments in isolation, but that the following combination of her impairments is "possibly severe" under 20 C.F.R. § 404.1520(c): "status post hydrothermal endometrial ablation and questionable Fibromyalgia, questionable schizophrenia, paranoid type; generalized anxiety disorder, not otherwise specified; dissociative disorder, not otherwise specified; and depressive disorder, not otherwise specified (20 CFR 416.920(c))." R. 28. However, the ALJ concluded at step three of the analysis that King's impairments, even in combination, did not meet or medically equal the severity of any of the impairments listed in the applicable regulations. R. 29. The ALJ further found, at steps four and five, that King has the residual functional capacity ("RFC") to perform light work,[1]

> except the claimant can stand and/or walk at least two hours without interruption and a total of at least six hours over the course of an eight-hour workday. The claimant can sit at least two hours without interruption and a total of at least six hours over the course of an eight-hour workday. The claimant cannot climb ladders, ropes, poles or scaffolds. The claimant can occasionally climb ramps and stairs. The claimant can frequently use her upper extremities for reaching overhead. The claimant can frequently use her lower extremities for pushing, pulling and the operation of foot controls. The claimant can frequently balance, stoop, kneel and crouch. The claimant

---

[1] Pursuant to the relevant regulations, light work
> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

can occasionally crawl. The claimant can occasionally work in humidity, wetness, and extreme temperatures. The claimant cannot work in poorly ventilated areas. The claimant cannot work at unprotected heights. The claimant cannot work with operating hazardous machinery. The claimant can frequently work while exposed to vibration. The claimant cannot operate motor vehicles. The claimant can perform simple, routine and repetitive work activity with the following exceptions. The claimant cannot perform work activity that requires her response to rapid and/or frequent multiple demands. The claimant can respond appropriately to supervision; however, she is better suited for and can perform work activity requiring only occasional supervision. The claimant can frequently interact with coworkers so long as interaction is casual. The claimant is limited to work activity that does not require interaction with the public.

R. 30. Ultimately, the ALJ concluded that King could perform both her past relevant work as an assembler and other jobs that exist in the national economy. R. 37. He therefore concluded that King was not disabled within the meaning of the Social Security Act from June 12, 2013 through the date of his decision, and he denied King's claim. R. 38.

On May 7, 2014, Sreelekha Banerjee, M.D., King's treating physician, completed a report of his opinions regarding King's limitations. Overall, Dr. Banerjee observed that King's limitations with regard to several areas of mental functioning were "extreme," which is defined as a "complete loss of ability in the named activity" such that the individual "cannot sustain performance during an 8-hour workday." R. 344–45. Dr. Banerjee indicated that King's limitations were extreme in the following categories of functioning: impaired ability to relate to others; restriction of activities of daily living; and the ability to maintain concentration, pace, and attention for periods of at least two hours. R. 344. Dr. Banerjee also observed that King's limitations were extreme with respect to her ability to follow directions, respond appropriately with supervisors and coworkers, handle customary work pressures, respond appropriately to changes in the work

6

environment, and use good judgment on the job. R. 344. Finally, Dr. Banerjee found that King suffered extreme limitations in performing complex, repetitive, or varied tasks and behaving in an emotionally stable manner. R. 345. Ultimately, Dr. Banerjee diagnosed King with schizophrenia, paranoid type; depressive disorder; and generalized anxiety disorder. *See* R. 343.

Dr. Banerjee regularly treated King at the Montgomery Area Mental Health Authority. On May 17, 2013, Dr. Banerjee noted that King was "doing well" with the psychotropic medications she was prescribed, but that she was having trouble sleeping. R. 288. Otherwise, King reported no side effects from her medication, no hallucinations or paranoia, and no suicidal or homicidal ideation. R. 288. Similarly, King had no side effects, delusions, paranoia, or suicidal or homicidal ideations in February of 2013, although Dr. Banerjee did record that her insight was "poor" and her judgment "impaired." R. 290.

On August 22, 2013, Dr. Alan M. Babb examined King at his office in Montgomery. R. 303. Dr. Babb had not been provided with any of King's prior medical records, but noted that she reported having been diagnosed with schizophrenia. R. 303. Most of Dr. Babb's physical findings were unremarkable, though he recorded that King was "very reserved, withdrawn, and depressed." R. 304. Dr. Babb's impressions included a psychiatric disorder, depression, and an anxiety disorder. R. 305. He concluded by stating that King's case would "be judged on psychiatric reasons and not for any specific medical reasons" and that the mental health records "need to be obtained to be able to give a clearer

and precise history of what mental health issues [King] has and what their expectations are." R. 306.

Two days later, on August 24, King was referred to Dr. Kristin R. Tubre, a licensed clinical psychologist. R. 309. Dr. Tubre first noted that King "may not have put forth adequate effort" and might have "exaggerated her symptoms" during her examination and interview. R. 309. Therefore, Dr. Tubre's findings with regard to King's level of functioning should be "interpreted with caution." R. 309. King reported to Dr. Tubre that she was diagnosed with schizophrenia in 2012 and had hallucinations, crying spells, isolation, paranoia, and a split personality. R. 310. Her hallucinations included a person named "Christine" and several small children. R. 310. King spoke to them during the interview. R. 310. She reported that her psychotropic medications did not decrease the hallucinations and that her medications caused her to be lethargic. R. 310. King reported having been sexually abused by her father as a child, as she also reported to both Dr. Babb and Dr. Banerjee. R. 310. King stated that she lived with a "male friend" who helped her care for herself, and that she depended "heavily on her friend for assistance with hygiene and food." R. 311. She nevertheless testified at the hearing that she lived at a boarding house for people with developmental disabilities, that the male friend did not live with her, and that only her family cared for her. R. 74.

Dr. Tubre found that King's "thought processes were not within normal limits," and that she displayed difficulty with thought content and interpreting proverbial statements. R. 311. She also struggled with attention and concentration and with spelling certain words forward and backward. R. 311. Her short-term memory was "impaired" and her "level of

8

cognitive ability appeared to be in the borderline range of intellectual functioning." R. 312. Dr. Tubre noted that, during the examination, King's mood fluctuated and she reported experiencing both auditory and visual hallucinations. R. 312. Ultimately, Dr. Tubre concluded that, despite the fact that King may have exaggerated her symptoms, she is "moderately to severely impaired" in her ability to comprehend, remember, and carry out instructions as well as to "respond appropriately to supervision, co-workers and work pressures in a work setting." R. 312. Her diagnostic impressions where that King had paranoid-type schizophrenia and fibromyalgia. R. 312. Dr. Tubre concluded by recommending additional psychological testing "to rule out malingering." R. 312.

King also saw Dr. Albert Lester in 2013 and 2014. These records, however, are almost entirely illegible, with the exception of a few individual words. *See* R. 348–54. Thus, the court is able to discern little of significance from Dr. Lester's treatment notes, and encourages King's counsel to submit records that are legible (and preferably typewritten) in the future to aid the court in its review. In her brief, King represents to the court that Dr. Lester diagnosed her with fibromyalgia and prescribed Lortab and Lyrica to treat her pain. *See* Doc. 12 at 5–6.

## IV. DISCUSSION

King presents three issues on appeal: (1) that the ALJ erred by improperly acting as both judge and physician; (2) that the ALJ failed to provide King with a full, fair, and unbiased evaluation of her claim; and (3) that the Appeals Council erred by denying King's request for review in light of the additional medical evidence she submitted. Because the

court agrees with each of King's first two arguments, any discussion regarding the Appeals Council's denial of review is unnecessary.

**A.     ALJ's Role as an Adjudicator**

King argues that the ALJ impermissibly occupied the role of both adjudicator and physician by referring to King's diagnosed fibromyalgia and schizophrenia as "questionable" and arbitrarily pretermitting any consideration of King's physical maladies, like fibromyalgia, while still incorporating physical limitations into his RFC assessment. *See* Doc. 12 at 4–7.

"An ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians . . . ." *Marbury v. Sullivan*, 957 F.2d 837, 840 (11th Cir. 1992) (Johnson, J., concurring). Regardless of an ALJ's personal feelings or suspicions, "as a hearing officer he may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional." *Id.* at 840–41. Of course, an ALJ is free to discredit the diagnosis of a treating physician, but only based on specific articulated reasons, *see Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987), that are supported by substantial evidence in the record. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). Indeed, an ALJ is not permitted to "make medical findings or indulge in unfounded hunches about the claimant's medical condition or prospect for improvement." *Haag v. Barnhart*, 333 F. Supp. 2d 1210, 1220 (N.D. Ala. 2004).

Here, the ALJ repeatedly indulged his own unfounded hunches about King's physical and emotional wellbeing and the effects of King's diagnoses on her ability to

function. Early in the opinion, the ALJ concluded that each of King's impairments is not severe individually, in part because he found that her fibromyalgia and schizophrenia—which had been diagnosed by multiple physicians—were "questionable." R. 28. The ALJ "[q]uite candidly" explained that he "does not believe that even collectively these impairments limit the claimant's capacity for work activity" because King's credibility undermines his "ability to assess limitation."[2] R. 28. However, despite his reservations, the ALJ "could not unequivocally rule out the possibility that collectively [King's] nonsevere impairments cause greater than slight limitation in her capacity for mental and physical work activity," so he continued with the required sequential analysis. R. 28.

In addition to being dismissive of King's diagnosed fibromyalgia and schizophrenia, the ALJ repeatedly granted little weight to the opinions of medical professionals based on his own conclusions about King's veracity. For example, the ALJ granted "some" weight to consultative examiner Dr. Tubre's opinion that King's limitations are moderate to severe. R. 35. According to the ALJ, any suggestion of limitations greater than the moderate limitations found in his RFC assessment "is not consistent with the totality of the evidence," including the ALJ's "own interactions with the claimant." R. 35. The ALJ also cast aside Dr. Babb's opinions regarding King's mental limitations but credited Dr. Babb's report to the extent it concluded that the outcome of King's claim would be determined by her mental functioning and not any physical limitations. R. 35. In so doing, the ALJ

---

[2] Despite the fact that he explicitly faulted King's credibility for his inability to assess her limitations, the ALJ acknowledged during the administrative hearing that he was "sure this record is not complete," and he did not "have a complete picture of [King's] functioning." R. 96. As discussed in the next subsection, ALJ's opinion does not reveal any circumstances that changed between the hearing and the date of the opinion so as to alleviate his concerns over the sufficiency of the evidence in the record.

11

arbitrarily relied on only those portions of Dr. Tubre's and Dr. Babb's reports that support his conclusion that King is not disabled, "without articulating specific, well supported reasons" for doing so beyond his blanket statements about King's credibility. *See, e.g.*, *Thomas v. Colvin*, 2016 WL 1048525, at *2 (M.D. Ala. Mar. 16, 2016); *Smith v. Colvin*, 2014 WL 518057, at *3 (S.D. Ala. Feb. 10, 2014) (gathering cases holding that an ALJ cannot pick and choose only those portions of medical opinions that support his opinion without offering an adequate explanation for doing so).

Similarly, the ALJ gave little weight to the report of Dr. Banerjee, a treating physician. After emphasizing that Dr. Banerjee's report was a "pre-planned document which allowed him to annotate the areas in which he believe [sic] that the claimant suffer limitation [sic] and what if any limitation she suffered," the ALJ found Dr. Banerjee's opinions regarding King's limitations "incredibl[e]." R. 35. The ALJ concluded that Dr. Banerjee's opinions were inconsistent with the "totality of the evidence in the record" and King's mental health treatment records without pointing to any specific records contradicting Dr. Banerjee's reports. R. 35. Instead, he noted the absence of "hospitalizations or restricted living arrangements consistent with such *extreme* limitations." R. 35. Additionally, the ALJ based his discounting of Dr. Banerjee's report on King's representation that she shops for three to four hours because she forgets things, concluding, while citing to no evidence, that if King is "amongst others for 3-4 hours, she certainly does not suffer extreme limitation in her ability to interact with others." R. 36.

Of course, the ALJ must give substantial weight to the opinion of a treating physician unless the: "1) treating physician's opinion was not bolstered by the evidence;

(2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). In totality, the ALJ's reasons for discrediting Dr. Banerjee's assessment include: (1) King's lack of hospitalizations or "restricted living arrangements"; (2) her ability to shop for three to four hours at a time; and (3) the fact that neither Dr. Babb nor Dr. Tubre had "voiced any concerns of extreme limitation." R. 35–36. These suppositions aside, the ALJ does not adequately explain how Dr. Banerjee's opinion was either not bolstered or contradicted by the evidence of record. The ALJ does not elaborate on his reference to "restricted living arrangements" or explain how the absence of such arrangements or a history of hospitalizations necessarily rebuts Dr. Banerjee's findings with respect to the limitations caused by King's diagnosed schizophrenia. Further, Dr. Babb's and Dr. Tubre's reports do not contradict Dr. Banerjee's opinions of King's limitations given that Dr. Babb concluded that King had a psychiatric disorder and Dr. Tubre concluded that she was "moderately to severely impaired" in her ability to follow directions and function in a work environment.

Thus, in addition to substituting his own belief about King's limitations for the opinions of licensed medical professionals, the ALJ picked and chose only those parts of the medical records that supported his ultimate conclusion and failed to demonstrate good cause for granting little weight to the assessment made by treating physician Dr. Banerjee. Further, as King points out, the ALJ admittedly refused to hear evidence regarding King's physical impairments, including her fibromyalgia, despite incorporating physical limitations into his RFC assessment. *See* R. 81 ("I'm sure you already figured out, I'm not

13

looking at the physical applications or physical aspects of this case.") & 30 (including a host of physical limitations into the RFC assessment). As with King's schizophrenia, the ALJ referred to her fibromyalgia as "questionable," R. 28, without making "factual findings supporting an inference" that King's physicians "were incompetent or otherwise failed to perform their duties in a professional manner." *Marbury*, 957 F.2d at 841. The ALJ's pattern of questioning King's truthfulness and the diagnoses of multiple medical professionals while failing to cite to the specific evidence supporting his conclusions makes it apparent that he substituted his own untrained opinions for those diagnoses. Accordingly, the court cannot conclude that substantial evidence supports the ALJ's opinion.

**B.     ALJ's Impartiality**

More fundamentally, the record on appeal calls into question the ALJ's impartiality. Social Security claimants are entitled to hearings that are "both full and fair." *Miles*, 84 F.3d at 1400. The ALJ's duty is to "carefully weigh the evidence, giving individualized consideration to each claim that comes before him." *Id.* at 1401. "The impartiality of the ALJ is thus integral to the integrity of the system." *Id.* A presumption exists that ALJs are unbiased, which can be rebutted by demonstrating a conflict of interest "'or some other specific reason for disqualification.'" *Putman v. Soc. Sec. Admin., Comm'r*, 2017 WL 4119042, at *5 (11th Cir. Sept. 18, 2017) (quoting *Schweiker v. McClure*, 456 U.S. 188, 195 (1982)). The Eleventh Circuit has emphasized the importance of the inquisitorial nature of Social Security proceedings:

> The SSA [Social Security Administration] is perhaps the best example of an agency that is not based to a significant extent on the judicial model of decisionmaking. It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits; review by the Appeals Council is similarly broad. *Id.* The regulations also make the nature of the SSA proceedings quite clear. They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner."

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000) (quoting 20 C.F.R. § 404.900(b)). Accordingly, an ALJ "shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." *Miles*, 84 F.3d at 1400 (quoting 20 C.F.R. § 404.940)).

By his own admission, the ALJ here did not give individualized consideration to components of King's claim by issuing a blanket refusal to consider the "physical aspects" of her claim and instead addressing only the limitations imposed by her schizophrenia. Even then, as discussed above, the ALJ explicitly acknowledged that the record was not complete on multiple occasions during the administrative hearing. And the ALJ made several suppositions and assumptions, both during the hearing and in his opinion, indicative of a preconceived skepticism of King's claim. For example, the ALJ opened the hearing with pointed questions about King's educational history:

> ALJ: So why did you leave [school after the eleventh grade]?
> King: Just wasn't making good grades, and I couldn't catch on.
> ALJ: All right. And why didn't you at least try to get a GED?
> King: I couldn't do it. My mental status, I think, could pass the test. I just couldn't.
> ALJ: So did you try?
> King: No, sir.

15

R. 49–50. Later in the hearing, King testified to having owned and operated a janitorial service in 2011 and 2012. *See* R. 52–55 & 58–63. However, the ALJ correctly suspected that King lied about the janitorial service for tax purposes, which she eventually admitted. *See* R. 73. From that point forward, the ALJ was outwardly skeptical of King's responses, probing her, for example, about the possibility that she lived with a male friend who she had mentioned to her doctors. *See* R. 73–77. Ultimately, King testified that the friend visited periodically, helped take care of her, and twice spent the night. R. 77.

Next, the ALJ turned his attention to King's children—for whom she no longer has custody—asking repeatedly whether she abused them and inquiring into the circumstances of the custody arrangement. *See* R. 78–81. King stated on multiple occasions that she was unable to care for her children because she was "unstable" and would "lash out." R. 78–79. After this exchange, the ALJ first indicated that the record was not complete and that he was not considering the "physical aspects of this case," but instead was "only concerned with the mental." R. 81. King's representative then referred to evidence in the record that purportedly established disability. R. 82. At this point, the ALJ shifted his focus to King's criminal history, stating "I don't want to hear the fluff. Just answer the question. Why did you go to prison?" R. 83. King explained that she was charged with the distribution of prescription pain medication, to which the ALJ responded, "You were about to tell me what about the physical evidence, counsel? She's selling her Lortab." R. 84. King added that she did not sell her medication, but that she gave some to a friend. R. 84–85. The ALJ did not accept this explanation, continuing as follows:

    ALJ:  How much were you selling your Lortabs for?

16

>   King: I didn't sell it.
>   ALJ: How much were you giving it away for?
>   King: I just give [sic] it to him because he said he had a toothache, but he was setting me up. I found out the reason why he done what he done [sic] to me. This is what happened . . .
>   ALJ: Ma'am, ma'am, you were convicted, right?
>   King: Yes, sir.
>   ALJ: That's all I need to know.
>   King: I did my time . . .
>   ALJ: Any other convictions of that nature?
>   King: Nothing but child support because that's what I had, and that's all.

R. 85–86.

Following this exchange, the ALJ shifted away from King's past criminal conviction toward the ultimate issue of disability:

>   ALJ: Let me ask you one more blunt question. Again, I don't want any fluff, I don't want any stories. I want you to straight up answer this question.
>   King: Yes, sir.
>   ALJ: All right? All joking aside, you and I, right now.
>   King: Yes, sir.
>   ALJ: Do you truly believe you cannot perform any work activity whatsoever? Think about it before you answer. Do you truly believe you cannot perform any work whatsoever?
>   King: Yes, sir, I do.
>   ALJ: Why?
>   King: I truly believe that.
>   ALJ: Why?
>   King: Because I know who I am, and I just lash out, and I don't want to hurt [anyone], and I'm just being honest.
>   ALJ: But luckily, you have two convictions, and none of them involve you lashing out. Or neither involves you lashing out. Why is that?

R. 86. The ALJ's skepticism continued:

>   ALJ: You're telling [me] you cannot work because of inability to get along with others.
>   King: Yes, sir.

17

> ALJ: But you've never been convicted of a crime involving the inability to get along with others. Why should I believe that you're unable to get along with others? You [are] doing quite fine here today. Well?
> King: I'm just being honest, your honor.

R. 87. To close the hearing, the ALJ telegraphed his thoughts on King's veracity and the legitimacy of her claim:

> ALJ: Based on what you told me about the janitorial service, nine [times] out of 10, I would have turned off everything here after you said that. Everything you said after that, I wouldn't have even cared.
> King: Yes, sir.
> ALJ: All right?
> King: I understand.
> ALJ: Be honest.
> King: Yes, sir.
> ALJ: If you cannot work, it will come out in your honesty.
> King: Yes, sir.
> ALJ: If you can, go back to work.

R. 98.

These exchanges are better described as cross-examination than a full and fair inquisitorial proceeding led by an impartial judge who is carefully weighing the evidence and developing the arguments both for and against the awarding of benefits. As is evident from the passages quoted above, the ALJ obsessed over what he perceived to be King's lack of honesty and exaggeration of her limitations, grilling her over her high school education, past conviction, custody of her children, and current living arrangements. It is hard to conceive of an examination by an impartial adjudicator that would more closely resemble an adversarial interrogation. For this reason, the court cannot conclude, based on the transcript of the administrative hearing alone, that the ALJ here has demonstrated the impartiality necessary to weigh the evidence and give individualized and careful

18

consideration to King's claim. And the ALJ's written opinion is plagued by the same indicia of partiality. *See* R. 28 (opining that he "does not believe that even collectively these impairments limit the claimant's capacity for work activity").

The court acknowledges that the ALJ is free to discredit a claimant's testimony. *See, e.g.*, *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). And the ALJ was correct to note that there are inconsistencies between King's testimony at the hearing and what she reported to her doctors at various times. *Compare* R. 66–67 & 74–75 (testifying that she has hallucinations and does not live with a male friend), *with* R. 304 (reporting that she lived with male friend) & 305 (reporting no evidence of delusions or hallucinations). There are also inconsistencies in the medical records themselves, and at least one doctor remarked that King may have been exaggerating her symptoms. *Compare* R. 288–90 (reporting to Dr. Banerjee that she had no delusions or paranoia), *with* R. 309–12 (reporting to Dr. Tubre that she has "auditory and visual hallucinations, crying spells, isolation, paranoia, and 'split personality'"). But a claimant's credibility is just one component of an ALJ's determination of benefits, and any reservations this court may have regarding King's truthfulness (and, indeed, the merits of her claim as a whole) do not foreclose its duty to set aside an opinion marred by bias and assumptions that are unsupported by substantial evidence in the record. Further troubling is the fact that "a biased ALJ might not properly develop the record" at all. *Allenstein v. Barnhart*, 419 F. Supp. 2d 1336, 1337 (N.D. Ala. 2006). For all of these reasons, the court is unable to determine whether substantial evidence supports a finding that King is not disabled until her case is heard by an impartial adjudicator.

## V. CONCLUSION

Based on the foregoing, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and based upon the proper legal standards. It is therefore ORDERED that the decision of the Commissioner denying benefits is REVERSED and this matter REMANDED for further proceedings consistent with this opinion. It is further ORDERED that this matter be reassigned to a different Administrative Law Judge.

A final judgment will be entered separately.

DONE this 16th day of January, 2018.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE